In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3963

United States of America,

Plaintiff-Appellant,

v.

Anthony T. Centracchio, Thomas R. Tucker,
Robert S. Urbinati, and Robert D. Natale,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 325--Robert W. Gettleman, Judge.

Argued April 12, 2001--Decided September 4, 2001


   Before Flaum, Chief Judge, and Manion and
Kanne, Circuit Judges.

   Manion, Circuit Judge.  Four defendants
were indicted for a RICO conspiracy and
obstruction of law enforcement based on
their alleged illegal video poker
gambling business. In pre-trial motions,
the district court excluded two pieces of
evidence: a guilty plea allocution and
the statements of a deceased co-
conspirator. The United States appeals
those rulings on an interlocutory basis.
With respect to the district court's
ruling on the guilty plea allocution, we
reverse. With respect to the district
court's ruling on the statements of a
deceased co-conspirator, we reverse and
remand.

I.

A.  Indictment

   On April 13, 2000, a grand jury returned
a superseding indictment charging Anthony
Centracchio, Thomas Tucker, Robert
Urbinati and Robert Natale with various
criminal offenses including RICO
conspiracy, 18 U.S.C. sec. 1962(d), and
obstruction of state or local law
enforcement with intent to facilitate an
illegal gambling business, 18 U.S.C. sec.
1511.

In Count One of the indictment, the RICO count, the government alleged that defendants Centracchio and Tucker, and an unindicted co-conspirator, Louis Eboli, were members of an illegal enterprise. Urbinati and Natale were allegedly employed by the enterprise. The RICO conspiracy allegedly began in about 1978 and continued until February, 1999 and consisted of illegal gambling activities which took place "in Franklin Park, Melrose Park, Northlake, Stone Park, and elsewhere in the State of Illinois."

Eboli was described as the leader of the enterprise until his death in 1987, some time after which Centracchio became the boss. Both allegedly distributed bribe money to law enforcement and public officials for the protection of their illegal activities. Tucker, a former Stone Park police lieutenant, was allegedly the second-in-command of the enterprise and relayed orders and distributed money from Centracchio and Eboli to others. Urbinati, a Franklin Park police officer between 1968 and 1995, allegedly received cash bribes from Tucker on a monthly basis to protect the gambling activities in Franklin Park. Natale, employed by the Stone Park police department from 1971 to 1989 and mayor of Stone Park from 1989 to the time of the indictment, also allegedly received cash bribes from Tucker on a monthly basis to protect the gambling activities in Stone Park. Seymour Sapoznik, another unindicted co-conspirator and the former Chief of Police of Northlake and Stone Park, Illinois, also allegedly received cash bribes from Tucker on a monthly basis to assure unhindered illegal operation of video gambling businesses in those towns.

In Count Three of the indictment, the government charged that between 1978 and December of 1994, all four of the named defendants conspired together and with Sapoznik and other law enforcement officers to obstruct the enforcement of the criminal laws of Illinois. In furtherance of the conspiracy, Tucker and Sapoznik allegedly met several times between March, 1993 and November, 1994, after Tucker had previously met with Centracchio.

B.  Seymour Sapoznik's Plea Allocution

On September 8, 2000, the government filed its Santiago proffer./1 In the proffer, the government sought to introduce Sapoznik's guilty plea agreement into evidence. Then, on September 29, 2000, the government filed a motion in limine to also admit his guilty plea allocution into evidence as a statement against penal interest, pursuant to Fed. R. Evid. 804(b)(3).

On February 6, 1997, Sapoznik had entered a guilty plea to a one-count information charging that, while the Northlake Chief of Police, he had received monthly bribes from "Individual A"/2, in violation of 18 U.S.C. sec. 1962. Sapoznik's written plea agreement was entirely prepared by the government, and filed with and accepted by the court. Therein, Sapoznik admitted that:

at the beginning of each month [between November 1990 and December 1994] Individual A made $500 bribe payments to defendant on behalf of the Outfit and at the direction of Individual A's boss in the Outfit. . . . These bribe payments were made in return for defendant's assistance in ensuring that the illegal activities of the Outfit, including the payment of money to winning players on joker poker machines in the town bars, were not investigated by the Northlake Police Department of which defendant was police chief.

At the plea colloquy, the government read the foregoing portion of the plea agreement out loud. The presiding judge then asked Sapoznik, "Mr. Sapoznik, did you hear what Mr. Levine just had to say?" Sapoznik responded, "Yes, I did, your Honor." The judge replied, "Is what he said the truth?" Sapoznik answered, "That is correct." This is the evidence which the government seeks to admit in the present case (referred to hereafter as the plea allocution).

Several months after this plea colloquy, Sapoznik was interviewed by a probation officer and he denied that he had accepted bribery payments while in Stone Park./3 At his subsequent sentencing hearing, the government presented evidence of "relevant conduct" refuting this denial and argued that Sapoznik was a liar. The trial court found that Sapoznik's denial was false. Sapoznik was

then sentenced to 87 months' imprisonment.

Sapoznik was unavailable to testify at trial in this case; his attorney stated that, even though he had been immunized pursuant to 18 U.S.C. sec. 6002, he would invoke his Fifth Amendment privilege and refuse to testify if called as a witness. Sapoznik's intransigence is confirmed by the fact that he previously chose to serve 14 months (in addition to his 87-month sentence) for civil contempt instead of obeying an immunity order compelling his testimony before the grand jury. Accordingly, the government sought to introduce into evidence the above-described portion of the colloquy from Sapoznik's guilty plea allocution for the limited purpose of proving the existence of the charged conspiracy. The government also proposed that a limiting instruction be read to the jury to explain the evidence./4

The defendants moved to exclude the evidence, arguing it lacked indicia of reliability because the government had argued at Sapoznik's subsequent sentencing hearing that he was a liar. The district court granted the motion, relying on the fact that Sapoznik had lied, thus finding that the evidence did not have a sufficient guarantee of trustworthiness under Fed. R. Evid. 804. The district court judge also stated that he was "concerned that under a 403 analysis it would be more prejudicial than it would be probative because of the basic lack of reliability that I find in this statement." The government moved for reconsideration, but the district court denied that motion as well for the same reasons, adding that "it's incredibly unfair to have a damaging statement like this read to the jury without any ability of the defense to cross-examine a person like that."

C.  Testimony of Edward Bluthardt, Jr.

In the government's Santiago proffer, it also sought to introduce the testimony of Edward Bluthardt, Jr., who would testify that he began work with the Schiller Park Police Department in about 1976, and served as its Chief of Police from 1980 to 1993. Bluthardt's father was mayor of Schiller Park during this time period. The government further proffered that

Bluthardt would testify, pursuant to Fed. R. Evid. 801(d)(2)(E), that several times in the late 1970s and early 1980s, he ran into Eboli at local restaurants and bars at which time Eboli would bring up the subject of video poker machines and how lucrative they were. Eboli allegedly promised him that once machines were put in Schiller Park, Bluthardt would be taken care of and get a lot of money. Bluthardt always responded that he and his father were opposed to the machines and would not allow them into town.

Defendant Natale filed a motion to suppress this testimony, arguing that the circumstances surrounding the conversations, which allegedly occurred over 20 years ago, and the fact that Eboli was dead, compelled their exclusion under Fed. R. Evid. 403. In addition, Natale argued that, since Bluthardt was not alleged to have been a member of the conspiracy, his statements were not properly admissible under Rule 801(d)(2)(E). The government responded that the statements were important evidence of Eboli's attempt to extend the conspiracy. The district court grantedNatale's motion, stating, in part, "I'm troubled by the remoteness in time and the fact that this is by this gentleman who is no longer alive about somebody's father who doesn't like to have them in his village . . . . I am concerned under a 403 analysis that this is very attenuated and not terribly probative." And, in its final ruling, the court stated, "Attenuated, it's probably a different conspiracy altogether, 403. Shall I go on?"

II.

18 U.S.C. sec. 3731 authorizes this court to review interlocutorily a district court decision suppressing or excluding evidence, where, as here, the United States attorney certifies to the district court that the appeal is not taken for the purpose of delay and the evidence is a substantial proof of a fact material in the proceeding. We review the district court's construction of evidentiary rules de novo, and the application of those rules to the facts for an abuse ofdiscretion. United States v. Robbins, 197 F.3d 829, 837 (7th Cir. 1999).

A. Seymour Sapoznik's Plea Allocution

   1. Rule 804(b)(3).

   The first issue on appeal is whether the district court correctly excluded Sapoznik's plea allocution, which the government sought to admit pursuant to Fed. R. Evid. 804(b)(3), the hearsay exception for statements against penal interest. The exception applies if the declarant is unavailable and the statement:

which was at the time of its making . . . so far tended to subject the declarant to . . . criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Fed. R. Evid. 804(b)(3). The government argues that a guilty plea allocution satisfies the requirements of this rule and that the district court committed a reversible legal error by focusing on Sapoznik's credibility.

   In Williamson v. United States, the Supreme Court had occasion to "clarify the scope of the hearsay exception for statements against penal interest." 512 U.S. 594, 596 (1994). The Court noted that "[r]ule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Id. at 599. The Court further stated that "[t]he question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." Id. at 603-04. In Williamson, the declarant had lied to the police when he was first interviewed and several hours later told a different story. Id. at 596-97. When the declarant refused to testify against a co-defendant, the Court ruled that the self-inculpatory parts of his confession were admissible at trial. Id. at 604. Likewise, the Supreme Court ruled that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even

if they are made within a broader narrative that is generally self-inculpatory." Id. at 600-01. When the statement implicates someone else along with the declarant, the statement has less credibility than ordinary hearsay evidence. Id. at 601.

Thus, as the Supreme Court in Williamson made clear, the district court should have addressed first whether the statements in Sapoznik's plea allocution were self-inculpatory, and if so, whether, in light of the surrounding circumstances, a reasonable person would have made those statements unless he believed they were true. First, under Williamson, "the district court must consider whether each statement, not just the confession as a whole, was truly self-inculpatory." United States v. Castelan, 219 F.3d 690, 694 (7th Cir. 2000). As in Castelan, the record before us is silent on whether the district court considered whether each statement in the plea colloquy was an admission of a fact or circumstance that tended to establish Sapoznik's own guilt. But our review of each of the statements in the plea allocution demonstrates that his statements are genuinely self-inculpatory.

The defendants argue that the plea colloquy was not completely self-inculpatory. Specifically, they point to those statements where, even though no other defendants are mentioned by name, Sapoznik admitted he took bribes from "Individual A . . . at the direction of Individual A's boss," thereby incriminating other persons. We do not find this argument persuasive. It is true that the crime of bribery, like that of conspiracy, by definition requires (at least) two participants. But Sapoznik's statements were truly inculpatory to him only because they did not seek to lessen blame as to his crime by spreading blame to others. While the admission of bribery necessarily implies that another person was involved, that is not the type of blame-spreading which typically raises concerns. See Williamson, 512 U.S. at 603 (noting that a declarant's squarely self-inculpatory confession--"I killed X"--will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory). As Justice Scalia

noted in his concurrence, "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant." Id. at 606 (Scalia, J., concurring); Robbins, 197 F.3d at 839 (quoting same). Thus, the plea allocution is admissible under Rule 804(b)(3) even if it tends to incriminate the other defendants when coupled with other evidence at trial.

Given the statement's self-inculpation, the district court next should have considered whether, in light of the surrounding circumstances at the time of its making, a reasonable person would have made the plea allocution unless believing it to be true. A plea of guilty is likely to be a classic statement against penal interest for obvious reasons, and the circumstances of this particular plea allocution support our conclusion. The defendants claim that Sapoznik did not plead guilty because he actually committed the crime of bribery. Rather, they argue that he was induced to plead guilty because he thought he was getting a good deal from the government. They allege that Sapoznik's assumption later turned out to be wrong because the government allegedly reneged on the plea agreement's guideline calculations. The district court stated that this rendered the statement "inherently unreliable given the circumstances of this plea." Our own review of the plea agreement itself reveals that paragraph 6(e) provided "the defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government at the time of this Agreement . . . the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation." Nevertheless, even assuming Sapoznik was promised a "good deal" by the government, a reasonable person, with benefit of counsel, under oath, in front of a federal judge, with no promise of leniency in the actual plea agreement, and risking a substantial prison term, would likely not admit that he committed the crime of racketeering by accepting monthly bribes, unless believing that statement to be true. It is also safe to

assume that when an accused person pleads guilty he is getting (if not a "good deal") a better deal than risking the consequences of going to trial.

Thus, in light of all the circumstances of the plea allocution, we find that it was properly admissible under Rule 804(b)(3). To the extent that the district court considered Sapoznik's later lack of credibility (especially based on events occurring several months after the plea allocution), it erred as a matter of law. Indeed, as the Supreme Court made clear, "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson, 512 U.S. at 599 (emphasis added). Thus, the district court's failure to admit the allocution under Rule 804(b)(3) was an abuse of discretion.

We also address the district court's concern that the defendants would be unable to cross-examine Sapoznik. The inability to cross-examine a declarant is not a ground for excluding a statement under Rule 804(b)(3) because the unavailability of the declarant is a prerequisite to the admission of such statements. See Fed. R. Evid. 804(a)(2) and (b)(3). In any event, the rules of evidence address the problem of impeaching an unavailable declarant: "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed. R. Evid. 806. Thus, to the extent that the district court rested its exclusion of the plea allocution on the defendants' inability to cross-examine Sapoznik, it erred as a matter of law./5


2.  Sixth Amendment Confrontation Clause.

Finding that the plea allocution was properly admissible under Rule 804(b)(3) does not end our analysis. Even if the plea allocution qualifies as a statement against penal interest, the defendants argue that its admission would violate

the Confrontation Clause of the Sixth Amendment. It is unclear whether the district court rejected this argument or whether it was an alternative basis for its ruling. Regardless, we conduct a de novo review of "an evidentiary ruling that affects a defendant's Sixth Amendment right to confront witnesses, and independently review whether the proffered guarantees of trustworthiness satisfy the demands of the [Confrontation] Clause." Castelan, 219 F.3d at 694 (citations omitted).

The Confrontation Clause of the Sixth Amendment guarantees the accused the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). This rigorous testing is most often conducted through the use of cross-examination. California v. Green, 399 U.S. 149, 158 (1970) (describing cross-examination as the "greatest legal engine ever invented for the discovery of truth."). However, courts allow hearsay to be admitted, even without the process of cross-examination, where "(1) 'the evidence falls within a firmly rooted hearsay exception'/6 or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." Lilly v. Virginia, 527 U.S. 116, 124-25 (1999) (plurality opinion) (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).

In Lilly v. Virginia, a plurality of the Supreme Court held that an accomplice's confession that inculpates another criminal defendant is not within a firmly rooted exception to the hearsay rule (even if the statement was technically against his own penal interest). 527 U.S. at 134. The plurality stated that it is

unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core

concerns of the old ex parte affidavit practice--that is when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

Id. at 137. The plurality then ruled that admissions by an accomplice which incriminate a co-defendant are only admissible when they contain "particularized guarantees of trustworthiness" because "such statements are suspect insofar as they inculpate other persons." Id. at 139. The Lilly court concluded that the statements before it did not bear the guarantees of trustworthiness, where the police had extracted a confession from a drunk co-defendant in the middle of the night, id. at 121, and the declarant was primarily responding to the officers' leading questions, id. at 139.

Like the plurality in Lilly (which was addressing a state law hearsay exception), we have concluded that statements under Rule 804(b)(3) which spread or shift blame to others do not fall within a "firmly rooted hearsay exception." See United States v. Ochoa, 229 F.3d 631, 637 (7th Cir. 2000). We need not decide whether statements, like Sapoznik's plea allocution, which do not spread or shift blame, fall within such an exception because, as explained below, we conclude that the allocution contains particularized guarantees of trustworthiness to justify its admission into evidence.

This court, citing Lilly, has explained that the "guarantees of trustworthiness must be inherent in the circumstances of the testimony itself . . . ." Castelan, 219 F.3d at 695. Thus, we look to the circumstances of the plea allocution itself. The defendants argue that Sapoznik's one-word answers to the judge's questioning at the plea colloquy are the functional equivalent of those ex parte affidavits so frowned upon by the Supreme Court in Lilly. In our own case law, we have placed emphasis on whether the government was involved in the production of the statement sought to be admitted into evidence. See Castelan, 219 F.3d at 695-96 (admission of declarant's custodial confession to law enforcement officers violated Confrontation Clause

where declarant specifically inquired as to benefits of his cooperation); Ochoa, 229 F.3d at 638 (statements to an FBI agent violated Confrontation Clause where agent gave declarant an incentive to curry favor by implicating his co-conspirators and where declarant's story spread blame to other participants). Contrast Denny v. Gudmanson, 252 F.3d 896, 903 (7th Cir. 2001) (confessions to friends and relatives were admissible under Confrontation Clause where made in the course of noncustodial conversations, were not blame-shifting and were self-inculpatory); Robbins, 197 F.3d at 840 (declarant's voluntary statement to his fiancee admissible under Confrontation Clause).

However, none of our cases addressing the scope of Lilly have involved plea allocutions, such as the one before us. The Second Circuit has had occasion to do so in a number of cases, and we find those cases persuasive. For example, in United States v. Gallego, 191 F.3d 156, 166-68 (2d Cir. 1999), the court found that a plea allocution of an unavailable co-conspirator declarant was admissible under Rule 804(b)(3) and under the Confrontation Clause. The admitted references included conspiring with other participants. Id. at 168. The court focused on the fact that the declarant faced a significant prison sentence, that he delivered the allocution under oath and before a judge, that "only self-inculpatory portions of the allocution" were introduced and that the district court "limited the impact of those excerpts by instructing the jury to consider George Gallego's allocution only as evidence of a conspiracy." Id. Likewise in United States v. Moskowitz, 215 F.3d 265, 269 (2d Cir. 2000), the court found that a guilty plea allocution had the requisite guarantees of trustworthiness where it subjected the defendant to a lengthy prison term, was given under oath and where a limiting instruction was given to the jury. See also United States v. Petrillo, 237 F.3d 119, 122-23 (2d Cir. 2000) (guilty plea allocutions were properly admitted even though there is the "potential for coercion or misrepresentation during the negotiation over guilty plea allocutions").

Like the Second Circuit in Gallego,

Moskowitz and Petrillo, we find that Sapoznik's redacted plea allocution contains the particularized guarantees of trustworthiness that justify its admissibility under the Confrontation Clause. As we discussed above, the mere fact that Sapoznik may have pleaded guilty to get a "good deal" does not mean he lied about his actual guilt. And, while the government was admittedly involved in the production of the text of the plea allocution, this is distinguishable from our cases addressing custodial confessions. No one has presented evidence in this case to suggest that the wording of the plea colloquy was coerced or manipulated for the purpose of indicting other individuals. The mere fact that the prosecutor recited the actual content of the plea agreement and Sapoznik just acknowledged with a short reply that he agreed with it does not persuade us that the allocution is inherently unreliable. Of course, it would be preferable if every sentencing judge encouraged defendants to put their guilty pleas into their own words, rather than merely adopting the prosecutor's statements. This would allow the reviewing court to more easily determine whether the defendant understood the charges before him and whether he freely admitted those crimes. See, e.g., United States v. Martinez, 169 F.3d 1049, 1054 (7th Cir. 1999) ("An open-ended question, inquiring into whether the defendant has any firm beliefs about . . . his decision to plead guilty could better flesh out these situations, and aid district courts in the first instance, and appellate courts on review, in assessing the validity of a defendant's claim to withdraw his plea."). See also Fed. R. Crim. P. 11(f) (stating that "[n]otwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea."). Nevertheless, we find that the circumstances before us, the fact that the statements were genuinely self-inculpatory and did not seek to downplay his own role, that Sapoznik had the benefit of counsel, that he was under oath in front of a federal judge, with no promise of leniency, and risking a prison term, and the limiting instruction proposed by the government, constitute sufficient guarantees of trustworthiness

such that the plea allocution's admission into evidence will not violate the defendants' rights under the Sixth Amendment's Confrontation Clause. See Williamson, 512 U.S. at 605 ("the very fact that a statement is genuinely self-inculpatory--which our reading of Rule 804(b)(3) requires--is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause."). Cf. Richardson v. Marsh, 481 U.S. 200, 211 (1987) (holding that Confrontation Clause was not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when the confession was redacted to eliminate the defendant's name and existence).

B.  Testimony of Edward Bluthardt, Jr.

   We now turn to whether the district court correctly excluded the testimony of Edward Bluthardt, Jr., a police officer and son of the mayor in Schiller Park. In its Santiago proffer, the government sought to introduce Bluthardt's testimony that a deceased and unindicted co-conspirator, Eboli, had attempted to bribe him to bring video gambling machines into Schiller Park./7 The government argued this evidence was admissible under Fed. R. Evid. 801(d)(2)(E) as evidence of a statement by a co-conspirator./8 Such statements are admissible where the government establishes, by a preponderance of the evidence, that (1) a conspiracy existed; (2) the defendant and the person making the statement were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175 (1987); Stephenson, 53 F.3d at 842. We review the district court's decision to exclude this testimony for an abuse of discretion, United States v. Skidmore, 254 F.3d 635, 638 (7th Cir. 2001), and we review a trial court's determination that the government has proved these three elements under a clearly erroneous standard. Stephenson, 53 F.3d at 842.

   However, our review of the transcripts indicates that the district court did not go through a Rule 801(d)(2)(E) analysis and instead excluded the evidence under Rule 403./9 We review a district

court's exclusion of evidence under Rule 403 for an abuse of discretion. United States v. Gardner, 238 F.3d 878, 881 (7th Cir. 2001). The district court did not find that Bluthardt's proposed testimony was unduly prejudicial, would mislead the jury or that it would create undue delay, all typical Rule 403 considerations. Rather, it stated that it was concerned that the evidence was too remote in time, that Eboli was deceased, that it probably involved a different conspiracy altogether and was not probative.

First, the government argues that the court incorrectly concluded that the statements were too remote in time. We agree. While the statements were made over twenty years ago (they were allegedly made in the 1970s and 1980s), the charged RICO conspiracy was alleged to have begun in 1978. If evidence were excludable on the sole basis that it stretched back over the decades, the government would be substantially limited in attempting to prove its case. There is no expiration date on probative testimony. Of course, the defendants may wish to present evidence, or argue on cross-examination, that Bluthardt's recollection is poor or that his testimony is otherwise not believable. However, this does not mean the evidence is unduly prejudicial. Instead, it goes to its credibility, a determination the jury is particularly suited to make. See Mejia, 909 F.2d at 245. Accordingly, it was an abuse of discretion for the court to exclude the evidence based on the fact that the conversations were remote in time.

Second, the government argues that the court incorrectly focused on Eboli's death. The government argues that the death of a co-conspirator is an insufficient basis to exclude evidence of his statements. Cf. United States v. Guzzino, 810 F.2d 687, 695 (7th Cir. 1987) (witness' testimony regarding co-conspirator statements made by deceased co-conspirator sufficient to support conviction). If Eboli's statements (and Bluthardt's repetition of them) are otherwise admissible under a hearsay exception, we cannot see how his death creates a problem under Rule 403. There is no danger of unfair prejudice, confusion of the issues, or misleading the jury, nor are there considerations of

undue delay, waste of time, or needless presentation of cumulative evidence. Nor did the district court explain why Eboli's death would create any such problems. Accordingly, we believe the district court abused its discretion by excluding the evidence under Rule 403 based on Eboli's death.

Next, the government argues that the court incorrectly speculated that the testimony involved a different conspiracy by focusing on the fact that Eboli's attempted bribery of Bluthardt was in a town other than one specifically named in the indictment. We agree. The government seeks to present the evidence as an (unsuccessful) attempt to expand the conspiracy by influencing public officials. The indictment specifically stated that the conspiracy existed in various named towns and "elsewhere in the State of Illinois." In addition, the indictment itself need not allege each and every overt act committed by the co-conspirators in furtherance of that conspiracy. See, e.g., United States v. McKinney, 954 F.2d 471, 476 (7th Cir. 1992) ("a jury may base a conspiracy conviction on proof of an overt act not charged in the indictment."). Accordingly, it was an abuse of discretion for the district court to exclude Bluthardt's testimony under Rule 403 because it refers to a town not specifically charged in the indictment.

Lastly, the government argues that the district court abused its discretion in concluding that the evidence was not probative. We agree. The testimony, if true, is certainly probative of the existence and structure of the conspiracy and that one aspect of the conspiracy included bribery of law enforcement and public officials. In addition, we see nothing unfairly prejudicial about the testimony. True, the testimony makes the defendants look guilty, but probative evidence is always prejudicial in this literal sense. However, such prejudice is not "undue" and is therefore not subject to exclusion under Rule 403. See United States v. Bradley, 145 F.3d 889, 893 (7th Cir. 1998).

We note that the district court's exclusion of the evidence under Rule 403 is somewhat inconsistent with its ruling admissible the testimony of Michael

O'Donnell, a Franklin Park bar owner, who will testify that, in the mid 1980s, Eboli asked him to offer Bluthardt $50,000 to allow video poker machines into Schiller Park. If that testimony is not too remote in time, related to a different conspiracy or affected by Eboli's death, we do not see how Bluthardt's own testimony is unduly prejudicial or insufficiently probative under Rule 403. All in all, we believe the district court abused it discretion by excluding Bluthardt's testimony under Rule 403 and we remand the matter for the district court to make a determination of whether the testimony otherwise qualifies as a statement of a co-conspirator under Rule 801(d)(2)(E), an issue that it did not address and thus we cannot review.

## III.

In sum, with respect to the district court's ruling on the guilty plea allocution, we reverse, finding that the admission of Sapoznik's plea allocution satisfies the demands of both Fed. R. Evid. 804(b)(3) and the Sixth Amendment's Confrontation Clause. With respect to the district court's ruling on the statements of a deceased co-conspirator, we find that the district court abused its discretion in excluding them under Fed. R. Evid. 403 and remand for further proceedings.

FOOTNOTES

/1 The court has a duty to screen proposed co-conspirator statements for admissibility. See United States v. Stephenson, 53 F.3d 836, 842 (7th Cir. 1995); Fed. R. Evid. 104(a). A recognized way of bringing such issues to the court's attention is through the filing of a pre-trial proffer pursuant to United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978). See United States v. Rodriguez, 975 F.2d 404, 406 (7th Cir. 1992).

/2 Defendant Tucker was referred to by name in Sapoznik's December 2, 1994 confession, but was referred to anonymously in this plea agreement because he had not yet been indicted.

/3 In his plea agreement, Sapoznik did not plead guilty to taking bribes while in Stone Park, only in Northlake.

/4 The proposed instruction was: "You have heard statements from the federal plea allocution of

Seymour Sapoznik. You may consider these statements as evidence of the activities of Seymour Sapoznik and that is relevant to the case. You may consider these statements as evidence and, like any other evidence in this case, give these statements such weight as you believe appropriate. Please understand, however, that you may only consider these statements on the issue of whether the conspiracies charged in Counts One and Three existed. You can not consider this evidence in determining whether a particular defendant joined the charged conspiracies."

/5 In addition to its Rule 804(b)(3) ruling, the district court also relied on Rule 403, finding that the evidence was probably not probative, based on its conclusion that Sapoznik was a liar. Credibility determinations are properly in the province of the jury and not for a court to determine. See United States v. Mejia, 909 F.2d 242, 245 (7th Cir. 1990). See also United States v. Jackson, 208 F.3d 633, 637 (7th Cir. 2000) (noting that a judge does not have the "right to prevent evidence from getting to the jury merely because he does not think it deserves to be given much weight."). Accordingly, the district court abused its discretion in excluding Sapoznik's plea allocution under Rule 403 on this basis.

/6 The concept "firmly rooted hearsay exception" for Confrontation Clause purposes does not mean merely a hearsay exception under the Federal Rules of Evidence, but rather one that "in light of longstanding judicial and legislative experience . . . rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." Lilly, 527 U.S. at 126 (citations omitted).

/7 There is a dispute in the briefs about the intended scope of Bluthardt's testimony. According to the United States' Reply to Defendant Natale's Response to United States' Santiago Proffer, Bluthardt's anticipated testimony included evidence regarding anti-gambling ordinances in Schiller Park and regarding Eboli's attempts to bring video gambling machines into Schiller Park. The argument before the district court, and presumably its ruling, involved both portions of the testimony. However, on appeal, the government only challenges the district court's exclusion of the second aspect of Bluthardt's testimony. Thus, we limit our analysis to that portion of the evidence and leave undisturbed the district court's ruling as to the first aspect of the testimony.

/8 Fed. R. Evid. 801(d)(2)(E) provides that a statement is not hearsay if it is "offered against a

party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

/9 Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."